IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 9, 2001 Session

# RAYMOND L. COX v. THOMAS R. HICKS

**Direct Appeal from the Chancery Court for Anderson County**
**No. 98CH6453     Hon. William E. Lantrip, Judge**

**FILED AUGUST 7, 2001**

**No. E2000-01141-COA-R3-CV**

This dispute between two businessmen involves issues on the nature and extent of a partnership and the interaction and enforcement of a mediation settlement agreement. Plaintiff appeals the limitation placed on the partnership agreement and enforcement of the mediation agreement by the Trial Court. We affirm.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

Vivian L. Crandall, Oak Ridge, Tennessee, for Appellant.

George H. Buxton, III, and Harold P. Cousins, Jr., Oak Ridge, Tennessee, for Appellee.

## OPINION

This is a dispute between Raymond Cox (Cox) and Thomas Hicks (Hicks), who are in the business of buying and developing land in Anderson County, Tennessee. In 1996, Cox and Hicks purchased a tract of land known as the "Hillon Property" which was conveyed to them by Warranty Deed. They next entered into a contract to purchase the Onelda Human property, and on August 27, 1997, they entered into a written partnership agreement, which stated in part that these parties would generally acquire and develop real property and engage in residential and commercial development.

At that time, Hicks suggested to Cox that they purchase another parcel known as the Maples Property, and they did obtain an option to purchase that property in September of 1997. The parties ultimately obtained a Warranty Deed to the Human property in December, 1997 and the deed to the Maples property in February of 1998.

In 1997, Hicks joined with the Tim Georges to purchase property known as the Price property, and in September of 1998, Hicks along with Tim George and Mike Malicoate purchased an industrial tract known as the Weaver Tract.

These purchases by Hicks led to Cox filing this action against Hicks alleging that he and Hicks had a partnership, and that Hicks had breached his fiduciary duties as a partner by failing to include Cox in the purchase and development of the properties referred to as the "Price Property" and the "Weaver Residential Property."

Hicks filed his first Motion for Partial Summary Judgment, stating there was no agreement or discussion to do any further development beyond the Hillon, Human and Maples tracts with Cox. The Trial Court granted Hicks summary judgment as to the Weaver property, but not as to the Price property.

Subsequently, Hicks filed a Counter-Complaint, asking the Court to require specific performance of a Mediation Settlement Agreement that had been entered by Hicks and Cox with regard to the dissolution of their partnership and distribution of jointly-held property not in dispute. The Mediation Settlement Agreement (MSA), dated September 21, 1999, provided that Hicks would purchase the property mentioned therein from Cox, based upon a calculation of the fair market value less the indebtedness owed. The MSA provided that each party would chose an appraiser and those two appraisers would pick a third. The mediator would then take the two appraisals closest in value to each other and average those values to arrive at the Fair Appraised Value of the jointly owned property. Cox refused to perform once the appraised value was determined. The Trial Court Ordered the MSA be specifically performed, but reserved the issue for trial of whether Hicks' calculations of the amount due were appropriate, or whether additional sums were due.

Following trial on the remaining issues, the Trial Court found there was no writing describing the land associated with the partnership, and there was no meeting of the minds to include the Price or Weaver Industrial Tracts. The Court entered Judgment for Hicks.

On appeal, the issues before the Court are whether the Trial Court erred in granting partial summary judgment for the Defendant and thereby requiring specific performance of the Mediation Settlement Agreement, and whether the Trial Court erred in finding that the partnership agreement did not extend to cover the acquisition and development of the disputed properties?

Our review of the motion for summary judgment involves purely questions of law, no presumption of correctness attaches to the lower court's judgment. *Bain v. Wells*, 936 S.W.2d

618, 622 (Tenn. 1997).

Summary judgment is appropriate where there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *Byrd v. Hall*, 847 S.W.2d 208, 210-211 (Tenn. 1993). The moving party is entitled to a judgment as a matter of law on the undisputed facts. *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993). The moving party has the burden of proving that its motion satisfies the requirements of Tenn. R. Civ. P. 56. *Bain*.

In this case these facts are not in dispute. On September 24, 1999, Cox and Hicks, represented by counsel, agreed to enter into a Mediation Settlement Agreement to dissolve, windup and terminate the partnership and to resolve all issues concerning their co-owned real property. The MSA listed the three groups of undisputed, jointly-owned, real property:

(a)     Lots in Phase One and Phase Two of Glen Alpine Subdivision;
(b)     Commercial tract being one acre, tract located on the north side of State Highway 61.
(c)     The Human/Hillon Tracts being approximately 8.3 acres located on State Highway 61.

The MSA provided that Hicks would purchase from Cox the aforementioned tracts based upon the "Fair Appraised Value" less the indebtedness owned to Home Federal Bank and other set-offs. The purchase price would be one-half of the net equity in said properties.

The MSA set forth the following procedure for determining "Fair Appraised Value":

2. Fair Appraised Value. The Fair Appraised Value shall be determined as follows:

(A) COX shall pick one MAI appraiser and HICKS shall select one MAI appraiser.

(B) The two appraisers shall jointly select a third MAI appraiser from Knox County, Tennessee.

(C) Appraisals shall be submitted to the mediator and upon submission of the three appraisals, the mediator shall select the two appraisals that are closest together numerically. Those two appraisals shall be averaged and that average value shall be the Fair Appraised Value of all jointly owned property.

The MSA further provided that "the parties shall immediately prepare a description of each of the tracts to be appraised and submit the same to their respective appraisers." The MSA did not provide any specific methodology, guidelines, or requirements upon which the appraisals

were to be made by the selected appraisers.

Cox selected as his appraiser Hop Bailey, Hicks selected Lewis Pipkin, and the two appraisers then selected William S. Broome as the third appraiser. Bailey found the total value of the property to be $2,180,000.00; Pipkin valued the total property at $1,210,000.00; and William Broome appraised the property at $1,219,000.00. Following the formula set forth in the MSA, the mediator found the Fair Appraisal Value of the property to be $1,214,500.00 before any adjustments.

Cox objected to the results because in his opinion, "Defendant fraudulently supplied the appraisers with inaccurate information to reduce the value of the property." He argued that "there is nothing in the record to establish the facts used by the appraisers were accurate information. Cox submitted an affidavit in which he said:

> 3. The appraisals were to be based upon the lot prices that were jointly agreed to by Mr. Hicks and myself when we began the Glen Alpine Development. These agreed upon lot prices are listed in a price sheet for Phase I dated August 1, 1997 and for Phase II dated August 10, 1998. . . . I submitted these agreed lot prices to Mr. Bailey for his use in his appraisal.

> 4. When I received Mr. Pipkin's report, I noticed on page 24 that he used completely different lot prices in his evaluation. I learned that Mr. Hicks provided Mr. Pipkin with a price sheet dated December 1, 1999, which listed the lots at lower prices than those we agreed upon in Exhibit G. . . . Mr. Hicks and I never agreed to reduce the lot prices.

* * *

> 6. Mr. Pipkin and Mr. Broome also relied on incorrect information regarding the cost to excavate the commercial property. Both appraisers used an estimate dated December 29, 1999 in the amount of $538,886.00. . . Mr. Hicks and I had previously determined that the cost of excavating the commercial property would be in the range of $160,000.00 to $200,000.00.

Cox offered no competent evidence that the 1999 price list supplied by Hicks was a knowing or reckless misrepresentation, and in order to prevail on a claim of misrepresentation, it must be shown that the party made a knowingly or recklessly false misrepresentation as to material facts, which were justifiably relied upon by the other, and that he suffered damages as a result of that reliance. *Speaker v. Cates Co.*, 879 S.W.2d 811, 816 (Tenn. 1994).

While Cox claims the parties had agreed that the appraisals would be based on the agreed upon price list from 1997, thus making the 1999 price list a "fraudulent misrepresentation", the MSA makes no mention of what the appraiser should rely upon in arriving at the "fair appraised value". Specifically, there is no reference to the lot prices that Cox says were used in setting the

value of the excavation estimate. Cox is therefore attempting to alter the written document with parol evidence, despite the fact that the MSA is clear and unambiguous.

Our courts have held that a settlement agreement is merely a contract between the parties to litigation, and as such, the formation, construction and enforceability of a settlement agreement is governed by the law of contracts. *See Sweeten v. Trade Envelopes, Inc.,* 938 S.W.2d 383, 385 (Tenn. 1996); *Environmental Abatement, Inc. v. Astrum R.E. Corp.*, 27 S.W.3d 530, 539 (Tenn. Ct. App. 2000). Moreover, a contract must be interpreted and enforced according to its clear, plain and unambiguous terms. *Bob Pearsall Motors, Inc., v. Regal Chrysler-Plymouth, Inc.,* 521 S.W.2d 578, 580 (Tenn. 1975); *Gates, Duncan & Vancamp Co. v. Levantino*, 962 S.W.2d 21, 25 (Tenn. Ct. App. 1997). Because the MSA does not contain any ambiguities, the parties may not introduce extrinsic evidence to introduce additional terms into the agreement.

Cox also fails to present evidence that the appraisers relied upon the 1999 price list to Cox's detriment. He alleges such reliance in his affidavit, but lacking are any depositions or affidavits of appraisers stating that their appraisals would have been different had they not been given that price list. Broome indicates in his appraisal report that he was given both price lists, and also reviewed the lots which had already been sold. Broome further states:

> To estimate the market value of subdivisions, the appraiser will typically determine a current market value for each of the remaining subdivision lots and then determine an absorption schedule, which will calculate the estimate remaining time to sell these lots. In this scenario, lots that are estimated to sell at some point in the future will be discounted in price to obtain a current market value.

> For the subject subdivision, this format of estimating current market value will be difficult to implement due to the past sales history of the subdivision. In the first year (1997) 17 lots were sold, where 9 lots were sold in year 2 (1998) and only 2 lots were sold last year (1999). Due to this irregular sales patterns it would be difficult if not impossible to determine a [sic] absorption schedule for the subdivision.

> For this same reason, an alternative solution would be to sell the remaining lots at auction. A local auctioneer who is familiar with the Glen Alpine Subdivision was contacted and estimated that the subject lots would bring between 60% and 70% of list price or $17,500 to 22,500 per lot at auction. Under this scenario, all lots would be discounted up front and a [sic] absorption schedule would not be necessary.

> For the purposes of appraising the remaining 49 subject lots, a median value or $20,000 per lot will be used. This figure would be discounted by 10% for the auctioneer's commission, leaving a current market value of $18,000 per lot or $882,000.

> The foregoing establishes that Broome used his own method for valuing the lots, and

likewise, Pipkin also did more than merely rely upon the prices furnished by Hicks. In Pipkin's analysis, he states:

> As discussed in the report, the value of 49 remaining lots in Glen Alpine S/D is estimated by discounted cash flow analysis. Due to reported sales for 1999 and the declining lots sales since development of Glen Alpine S/D, a relatively lengthy sell-out period is projected. As a result, an auction may result in an equal or possibly greater value. However, for the purposes of this appraisal and given the uncertainty associated with auction sales, the subdivision development approach is used to provide an indication of present worth.

Pipkin also discusses two similar subdivision: Norris Woods S/D and Mill Creek Meadows. Both of these subdivisions experienced a decline in sales in recent years. Pipkin also spoke with several local real estate agents who also indicated that the residential market in Anderson County had slowed during the past two years. He also considered the sell rate, along with the historical lot prices and the list prices in estimating a lot value of $30,000.00. He then deducted the expenses associated with the sale of these lots in calculating his final value of the lots.

Cox also claims that Hicks misrepresented the cost of excavation of the commercial property. However, he does not present evidence that Hicks provided false information; he simply states that they had a previous estimate for the work that was significantly less. Again, there is nothing in the MSA regarding the basis for the appraisal, and no evidence that the parties had agreed to base the appraisal on the prior estimate. The appraiser were free to base their valuations on any evidence that they found to be credible.

Cox had the burden of proving every element of fraud. *Hiller v. Hailey*, 915 S.W.2d 800 (Tenn. Ct. App. 1995). Fraud is never presumed, and where it is alleged facts sustaining it must be clearly made out; the representation must be in regard to a material fact, must be false and must be acted upon by party in ignorance of its falsity, and with a reasonable belief that it was true. *Id.* at 802. Cox failed to present evidence to support his claim of fraud, and accordingly, the decision of the Trial Court on this issue is affirmed.

As to the scope of the partnership, our review is *de novo* upon the record, with a presumption of correctness as to the Trial Court's factual determinations, unless the preponderance of the evidence is otherwise. Tennessee Rules of Appellate Procedure, Rule 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The Trial Court's conclusions of law, however, are afforded no such presumption. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

The issue at trial was whether the Price tract and Weaver Industrial Tract were within the scope of the Partnership Agreement, such that Hicks breached his fiduciary duty to the partnership, when he purchased these tracts in his individual capacity. The Trial Court, in finding in favor of Hicks, found as follows:

With reference to the Weaver Industrial property I find that this property was never contemplated as being available for purchase until at least September, 1998. At all times prior to this date this land was either optioned to the City of Clinton or was being considered by the City to be included in an Industrial Park. Significantly, it was the property owner, Steve Weaver, after his negotiations with the city fell through, who contacted defendant Hicks about buying the land. . . . Mr. Weaver's testimony convinces me that no effort had been made by anyone to acquire this industrial land other than the City until he sought out Mr Hicks in the fall of 1998. Because I find Mr. Weaver's testimony credible, I have serious questions that any drawing could have existed which showed this industrial land.

I further find that the industrial project was significantly different in both costs and scope from the residential subdivision undertaken by the parties. While the plaintiff had no experience with industrial projects, the defendant testified to his substantial experience with such projects. . . .

With reference to the Price tract, the efforts to acquire this property originated with Tim George, whose wife was related to the deceased owner. This land was purchases from the executor of the Price estate by Mr. George who then sought participation from Mr Hicks.

* * * * *

. . . Even though a drawing of the Weaver residential tract as found in the defendant's possession showing access to the Glen Allen tract, I can not go further and find that it has any relevance whatsoever to the Weaver industrial or Price tracts.

The Trial Court heard the testimony of the witnesses and the Court's findings were based upon the credibility of the witnesses. The Trial Court is in the best position to assess credibility of witnesses, and where the issue hinges on the credibility of the witnesses, we will not reverse the trial judge unless there is clear, concrete and convincing evidence to the contrary. *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974). The evidence does not preponderate against the Court's finding that the Price tract and the Weaver industrial tract were not included within the scope of the partnership.

Tennessee Code Annotated § 61-1-120 addresses the duty that one partner owes to the other partners and the partnership:

Fiduciary duty of partners. -- (a) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or

-7-

liquidation of the partnership or from any use by him of its property.

The Uniform Partnership Act, adopted in this jurisdiction, as well as modern case law establish and recognize that the relationship of partners is fiduciary and imposes on them the obligation of the utmost good faith and integrity in their dealings with one another with respect to partnership affairs. *See Lightfoot v. Hardaway*, 751 S.W.2d 844, 849 (Tenn. Ct. App. 1988).

The fiduciary nature of the partnership relation means that a partner has a duty to share with the partnership those business opportunities clearly related to the subject of its operations. See 59A AM. JUR. 2D *Partnership* § 443 (1987). However, this does not mean that all business opportunities presented to a partner must be presented to the partnership. *Lightfoot*.

Cox attempts to extrapolate from the *Lightfoot* decision support for his argument that Hicks breached his fiduciary duty by arguing that unlike the plaintiffs in *Lightfoot*, Cox had the financial ability to participate in the purchase of the Weaver and Price properties. However, *Lightfoot* addresses the situation where the partner is buying partnership property, and not engaging in a outside enterprise. Therefore, it does not follow that *Lightfoot* represents the only situation in which a partner need not present a business opportunity to other partners or the partnership. For example, while a partner's fiduciary duty extends through the dissolution and winding up of the partnership, this duty does not apply to new business commenced after dissolution. See 59A Am Jur 2d Partnership § 432. Additionally, this duty does not prevent a partner from making plans, during the existence of the partnership, to begin a future business after the partnership is dissolved. See *Young v. Cooper*, 203 S.W.2d 376, 384 (Tenn. Ct. App. 1947).

Moreover, the use of a partnership opportunity to purchase property is not an improper appropriation where the partnership enterprise is entered for a limited purpose of developing specific real property other than the tract purchased and not as a general partnership for the purpose of buying any lands that might be profitably developed. *See Mathis v. Meyeres*, 574 P.2d 447 (Alaska 1978); *see* generally 59A AM. JUR. 2D *Partnership* § 447 (1987).

Hicks and Cox became partners in 1996 when Cox was searching for another individual to assist him in the acquisition and development of the Hillon properties. After commencing the development of this property, the parties entered into a formal, written, partnership agreement upon Hicks' request. This agreement did not specify what land was or was not to be included in the scope of the partnership. However, there was testimony that this was merely a formalization of the prior agreement between the parties, entered for tax and estate planning purposes. While Cox maintains that he and Hicks discussed the possible acquisition of some other surrounding properties, including those disputed in this case. Hicks maintains that this agreement was confined to the development of the Hillon properties.

The evidence preponderates that the agreement between the parties was not a general investment business. The partners were not pledged to spend any particular portion of their time looking after partnership affairs, nor did they agree to refrain from buying land individually or from

forming other partnerships to buy land. In fact, the evidence establishes that both Cox and Hicks were involved in other land investment entities formed before and after the partnership was created.

Of significance is the fact that the Price and Weaver investment opportunities did not come to Hicks as a result of his partnership with Cox. Hicks and George had worked together in the past on the development of both residential and commercial properties. As for the Weaver property, Cox admits that the property was not available for sale prior to September 1998. Taking into account the Trial Judge's finding on credibility, we hold that the evidence does not preponderate against the Trial Court's decision that the Price and Weaver properties were not contemplated as a part of the partnership development scheme, and Hicks breached no fiduciary duty owing to Cox.

Accordingly, we affirm the Judgment of the Trial Court, and assess the cost of the appeal to Raymond Cox, and remand to the Trial Court.

_____
HERSCHEL PICKENS FRANKS, J.